DORÉ, Judge.
The Fireside Mutual Life Insurance Company, hereinafter referred to simply as Fireside or as plaintiff, seeks by declaratory judgment to have determined the meaning and significance of a proyision found in LSA-R.S. 22:391, which first came into our laws as part of Section 10.01 of Act No. 195 of- 1948, the act that was known as the Insurance Code. Fireside prays that the provision be decreed to be repugnant to and irreconcilable with the other provisions of Chapter X (now Part X) of the Insurance Code and therefore null and void; or, in the alternative, that it be decreed to impair plaintiff’s contract with the state as reflected in its corporate charter and therefore violative of the Federal and state constitutions. Plaintiff alleged that the Secretary of State, in his capacity as Insurance Commissioner, ordered plaintiff to cease issuing policies on the cooperative or assessment plan; that this will cause plaintiff irreparable injury; and plaintiff prays that the Secretary of State and Ex-Officio Insurance Commissioner be enjoined from attempting to enforce the proviso complained of.
The provision in question made its appearance into our law when a comprehensive insurance code was adopted as Act No. 195 of 1948. That code contained then, as it does now, thirty-one parts and numerous subdivisions or sections. Part VII, LSA-R.S. 22:251 et seq. deals with “Domestic Industrial Insurers”; Part X, LSA-R.S. 22:391 et seq. is headed “Life, Health and Accident Insurers on the Cooperative or Assessment Plan”. There are separate .parts in the code for each general type of *226 insurance that can be written in the state. The section containing the controversial proviso, which was originally Section 10.01 and is now LSA-R.S. 22:391, reads as follows, with the controversial proviso being underscored:
“All life, health and accident insurers on cooperative or assessment plan organized and authorized to do business in this State at the effective date of this Code may continue to operate, provided, that from and after December 31, 1950, all policies issued by such insurers shall be subject to and in accordance with the laws and regulations of this State relative to industrial life insurance, and especially subject to the provisions of this Code relative to Domestic Industrial insurers, with the same insuring powers which they have on such date. The operation of such insurers shall be governed by the provisions of this chapter, and by all the applicable provisions of this Code not in conflict herewith.”
At a. pre-trial conference held by the District Judge plaintiff offered in evidence (1) an extract of House Bill No. 253 showing how the first section of Chapter X read when it was originally introduced in the legislature in 1948, (2) page 827 of the Senate Journal of 1948 showing the adoption of a Senate Committee Amendment to the same section, and (3) page 1150 of the Senate Journal of 1948 showing adoption by the Senate of the same amendment proposed by the committee except for a change in the date fixing the effective date of the amendment. Defendant objected to the offerings on the ground that they were incompetent, immaterial and irrelevant, and for the further ground that the regularity of the proceedings leading to passage of the act was not in dispute and that the proceedings of the legislature are not material to this case. The offerings were admitted subject to the objections. We believe that the offerings were properly admitted. In Corpus Juris, Vol. 59, p. 1017, Statutes, Sec. 605, we find the following principle stated:
“To determine the legislative intent in case of ambiguity, resort may be had to the history of the statute, and of the proceedings attending its passage through the legislature as disclosed by the legislative journals * * *.”
American Jurisprudence, Vol. 50, page 319, under Statutes, Sec. 327, states the rule thusly:
“Apart from opinions expressed in debates, the actual proceedings of the legislature, or the steps taken in the enactment of a law, or the history of the passage of the law through the legislature, may be resorted to as an aid in the interpretation of a statute which is ambiguous or of doubtful meaning.”
This practice has been followed by a large majority of the state courts as well as by the U. S. Supreme Court; see citations under notes 94, 95, 96 under 59 C.J. Sec. 605.
Provisos in a statute are by nature designed to accomplish some particular purpose at variance with the general sum and substance of the balance of the act. In addition to any other classification they will fall into one of two categories. Either they are carefully worked out and designed so that the proviso and the balance of the act are woven together somewhat like a tapestry, with the proviso fitting into the scene rather than having the appearance of an interloper or disrupting agent; or else they are added without adequate integration with the balance of the act, with the result that the proviso is like a patch on the tapestry or like a dam built half way across a stream, in conflict rather than in cooperation with the balance of the scene.
The legislative history of our insurance code, and particularly of Chapter X thereof, throws some helpful light on the proviso in question. The code was drafted by the Secretary of State and Ex-Officio Insurance Commissioner pursuant to legislative authority granted by Act No. 211 of 1946. Approximately two years work went into its preparation. When presented to the legislature in 1948 as House Bill No. 253 it contained in general the same headings, sections, and paragraphs as are now found *227 in the present code. Chapter X, as stated above, dealt with “Life, Health and Accident Insurers on the Cooperative or Assessment Plan”, and Section 10.01, which was the first section in the chapter, stated:
“All life, health and accident insurers on cooperative or assessment plan organized and authorized to do business in this State at the effective date of this Code may continue to operate with the same insuring powers which they have on such date. The operation of such insurers shall he governed by the provisions of this chapter, and 'by all the applicable provisions of this Code not in conflict herewith.”
The next section, 10.02, stated that:
“No such insurer may be organized, and no alien or foreign insurer may be qualified to do business in this State after the effective date of this Code.”
There were only five other sections to Chapter X; and because the determination of this case will hinge on the relationship of the first section, as finally adopted, to the other sections, or the conflicts between them, each section will be summarized here.
Section 10.03 (now LSA-R.S. 22:393) provides that any domestic insurer that issues any policy or makes any agreement with its members whereby, upon the decease or sickness of a member, any money or benefit is to be paid which money or benefit is derived from voluntary donations or from dues or assessments" collected from the members or a class of members, or accumulation thereof, shall be deemed to be engaged in the business of insurance upon the cooperative or assessment plan. Section 10.04, LSA-R.S. 22:394, requires each such domestic insurer to maintain on deposit with the state treasurer 'bonds of certain types amounting to $25,000. Section 10.05, LSA-R.S. 22:395, calls for an annual report (as is required of all other insurers). Section 10.06, LSA-R.S. 22:396, fixes policy limits and benefit limits for any one individual at $5,000; requires that any policy issued by an insurer authorized under this chapter shall have written in red ink on the first page the words “Assessment Plan”; and provides for payment of benefits within thirty days. It also provides that every policy issued after October 1, 1948 by any insurer authorized under this chapter shall contain a clause reserving to the insurer the right to increase or lay additional assessments to the extent necessary to have the insured pay his respective share of losses in case the mortuary fund should become depleted, and requires that all such increase in assessments or additional assessments be placed entirely to the credit of the mortuary fund. Section 10.07, LSA-R.S. 22:397, limits what can be used for salaries and operating expenses to one-third of the cash income from premiums, assessments, etc. (except that the full first year premiums could go for expenses) with the other two-thirds going into a mortuary fund for payment of policy benefits.
It is thus seen that in Chapter X of the Code, as it was first introduced in the legislature, assessment plan insurers then in operation were to be allowed to continue to operate with the same insuring powers they had on the effective date of the act; no others were to be organized or allowed to qualify; and certain guiding rules were laid down for their regulation as above summarized. Chapter X passed the House in this form. A Senate committee, however, broke into the first sentence of Section 10.01 and added after the word “operate” the following:
“comma, provided that from and after October 1, 1948, all policies issued by such insurers shall be subj ect to and in accordance with the laws and regulations of this State relative to industrial life insurance, and especially subject to the provisions of this Code relative to domestic industrial insurers,”
By a Senate floor amendment the date was changed from October 1, 1948 to December 31, 1950; and the proviso with that change was written into the section.
This resulted in a Code which said in the first sentence of Section 10.01 that after December 31, 1950 all assessment plan insurers (there was only one such insurer operating in the state, to-wit, plaintiff herein) shall be subject to the regulations relative to industrial life insurance, found in *228 Chapter VII, Sections 7.01 through 7.10, while the next sentence said such insurers shall be governed by the provisions of Chapter X. So, unless Chapter VII contained in general the same provisions as Chapter X there wo.uld perhaps be some conflicts as
Assessment' Insurers’ Chapter X
10.06 Life policy, maximum benefits— $5,000
10.06 Maximum health & Accident ben- , efits — $5,000
10.0.6 - Policies must contain clause reserving insurer the right to levy additional assessments or increase . rates
10.06 Benefits are to be paid in 30 days after due date
No specific capital requirements
10.07 Expenses of management limited to Ys of receipts
10.06 Policies must have written in red ink on first page the words “Assessment Plan”
No provision for accumulation of non-forfeiture benefits
Obviously these differences are such that no company can possibly be regulated both by the provisions of Chapter X and Chapter VII at the same time. It is interesting to note that after adoption of the code the Insurance Commissioner recognized some conflicts created by the proviso'-in question and called on the Attorney General for an opinion as to whether its provisions should be given legal effect. In a lengthy opinion the Attorney General evidenced an inability to reconcile the several conflicts arising by virtue of the proviso, and suggested that the matter was one for the courts to- decide.
In addition to the conflicts between the first and second sentences of Section 10.01, the first sentence itself contained conflicting provisions, in that it made the assessment insurer, from and after December 31, 1950, subject to regulations relating to industrials but at the same time said that the assessment insurers in existence might continue to to what regulations would govern the assessment insurer. And -in fact these two chapters did set up- requirements that are conflicting and entirely different from one another. Some of these differences are as follows:
Industrial Insurers Chapter VII
7.01-7.02 Life policy, maximum benefits —$1,250'
7.01-7.02 Maximum health & accident benefits — $40 per week
7.01, 7.09(2) Insurer cannot collect premiums over what is specifically named in the contract
7.09(7) Death benefits are to be paid within two months
7.04 Company required to have paid-in capital of $15,000 and minimum surplus of $15,000
No limitations fixed on management expenses
No. provision for assessments is allowed
7.06 Non-forfeiture benefits must be provided for in each life policy.
operate with the same insuring powers they had as of that date.
Just what was meant by “insuring powers” is perhaps a little vague. The Insurance Commissioner, in the original brief filed in this court, stated that there is a distinction between “Insuring powers” and “underwriting powers”; that the former refers to the types of insurance that a company may write, while the latter refers to the terms and conditions which a company may incorporate into its policy. But that distinction was abandoned, it would seem, by an argument presented by the Commissioner for the first time in a supplemental brief filed with this Court, wherein it is suggested that the phrase “with the same insuring powers which they have on such date” did not refer to powers which assessment insurers.have on such date but to powers of industrial insurers on that date. The odd part of that argument is that it took four years for it to- be conceived,
*229 Just what is referred to by the phrase “with the same insuring powers which tbey have pn such date” is made clear by a review of Section 10.01 as it was originally introduced in the legislature. At that time the only insurers mentioned in the section were assessment plan insurers, so of course it referred to them. The subsequent insertion of a proviso into' the section did not change the meaning of the last phrase or cause it to modify or refer to something else.
The Insurance Commissioner suggests also, in his supplemental brief, that all apparent conflicts can be resolved in. another simple way, namely, by recognizing that the proviso in question was to be effective only after December 31, 1950 and 'by considering all the rest of Chapter X as interim legislation designed only to cover the period from October 1, 1948 through December 31, 1950. This argument, like the other one presented in the supplemental brief, is weakened by the fact that its conception took nearly four years; and its force is completely destroyed by a look at Chapter X as it was originally introduced in the legislature. The chapter at that time constituted a sensible and ‘ rather well organized means of regulating assessment insurers. The proviso' was added for a purpose that was apparently not in keeping with the balance of the chapter. To give any effect to the proviso would require that the original and obvious purpose of all the balance of the chapter be disregarded or changed. This would result in the tail wagging the dog, and there is no rule of statutory construction that authorizes such an interpretation. It is our conclusion that the proviso' conflicts seriously with the remainder of the Chapter and that the conflicts are irreconcilable. ■
While effect should be given to all parts of a statute when it is possible to do so, the general rule is that a proviso which is directly repugnant to the purview or body of the act is inoperative and must be declared void for repugnancy. See 50 Am. Jur. 460, Statutes, Sec. 440, and citations given therein.
 Defendants have argued that because plaintiff, acquiesced in the Commissioner’s interpretation of the disputed section and obeyed the directives issued by the Commissioner, the company can not now be heard to question the correctness of that interpretation. What is overlooked in that argument is, first, that plaintiff never stopped objecting to the Commissioner’s interpretation, and second, that one cannot by acquiescence make valid that which is void. We are not faced here with the question of whether effect should be given to an administrative official’s construction of the statute because of long usage and general acceptance, for the Commissioner’s interpretation has affected only one party, and then only long enough for the matter to be brought before the courts.
Because of the conclusion we have reached there is no occasion for considering plaintiff’s alternative plea that the statute as interpreted by the Commissioner impairs plaintiff’s charter or contract with the state in violation with the Federal and State constitutions, and we express no opinion on that point. Neither is there occasion here for looking into the question of what kinds of policies, if any, Fireside can write in addition to cooperative or assessment policies; that will depend on its charter and the law under which it operates. We hold simply that the proviso in question is null and that the Insurance Commissioner has no right or power under LSA-R.S. 22:391 to prohibit plaintiff from continuing to write assessment policies.
For the reasons herein expressed, it is now ordered that the judgment appealed from is annulled, reversed and set aside and the following provision found in Section 10.01 of the Insurance Code (now LSA-R.S. 22:391), to-wit: “Provided, that from arid after December 31, 1950, all policies issued by such insurers shall be subject to and in accordance with the laws' and regulations of this State relative to industrial life insurance, and especially subject to the provisions of this' Code relative to Domestic Industrial insurers,” is decreed to be null, void, and of no effect; *230 and the Secretary of State and Ex-Officio Insurance Commissioner is permanently enjoined from attempting to enforce the proviso.
Reversed and rendered.